PEOPLE v. FISHER et al.

(Supreme Court, Appellate Division, Fourth Department. December 28, 1906.)

1. WOODS AND FORESTS—FOREST PRESERVE—CUTTING TREES—RECOVERY OF PENALTIES.

Article 7, § 7, of the state Constitution, provides for the preservation of lands constituting the forest preserve. Section 216 of the forest, fish, and game law (Laws 1900, p. 61, c. 20), provides that the forest preserve shall include lands owned or hereafter acquired by the state, among others those within the county of Herkimer. Section 222 (page 63) authorizes actions to recover damages and penalties for cutting or carrying away trees from state lands. *Held* that, where timber was cut on lands owned by the state in the county of Herkimer, the state was entitled to maintain an action for penalties.

2. STATES—OWNERSHIP OF LAND—ACQUISITION OF TITLE.

By the construction of a dam by the superintendent of public works, 1,594 acres of defendant's lands were inundated and the timber thereon destroyed. Later on the superintendent raised the dam, and 700 acres more of plaintiff's land were inundated. After the first overflow defendant presented and filed with the board of claims a claim for damages sustained, in which he stated that the state had appropriated the land overflowed and the timber thereon, to its own exclusive use and benefit. The board of claims awarded her certain damages, and in its decision found the state had permanently appropriated such land. Defendant was paid the amount of the award. After the second overflow defendant filed a like claim for damages caused by the raising of the dam. The board of claims in its award stated it was for a permanent appropriation of the lands described therein. The award described not only the lands actually covered by the water from the overflow, but also a belt of land surrounding these lands of 450 acres. After making the award, but before payment of the same, a map of the lands was filed in the office of the state engineer and surveyor, together with the description of the land as described in the award, with a statement therein "permanently appropriated for the use of the canal." A copy of the map and of the certificates therein were personally left with defendant, together with notice that the map and survey of the lands appropriated were filed in the office of the state engineer and surveyor. The superintendent further caused to be filed with the clerk of Herkimer county copies of the map, certificate, and notice, with proof of leaving personally with defendant. Thereafter a draft was drawn in favor of defendant for the amount of the second award, with the statement contained therein that it was in full payment of such award, and made for the permanent appropriation of, and damages to, lands in Herkimer county by reason of the raising of the crest of the dam. The defendant acknowledged the payment of the award; his receipt containing the same statement as the draft. *Held,* that defendant was divested of, and the state acquired title in fee, not only to the two tracts of land actually overflowed, but also to the belt of land of 450 acres.

3. WOODS AND FORESTS—CANALS—FOREST PRESERVES—PROTECTION OF WATER SUPPLY.

The holding by the state of a belt of timber land in connection with its canal system was not inconsistent with its being a part of the forest preserve, where the purpose of the holding was not to cut the timber and devastate the land, but to preserve and protect the water supply.

McLennan, P. J., and Nash, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by the people of the state of New York against Mary L. Fisher and the J. P. Lewis Company to recover penalties, under section 222 of the forest, fish, and game law, for cutting timber upon lands situate in the county of Herkimer, claimed to be owned by the state, and part of the forest preserve, and title to which is disputed by the defendants, the defendant Mary L. Fisher claiming to own the same. From a judgment entered in favor of plaintiff upon report of referee, defendant appeals. Affirmed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, NASH, and KRUSE, JJ.

C. D. Adams, for appellant.

Julius M. Mayer, Atty. Gen., and John K. Ward, for respondent.

KRUSE, J. If the lands upon which the timber was cut were owned by the state, it follows that the judgment was properly directed against the defendants, for it appears they are situated in the county of Herkimer, and section 216 of the forest, fish, and game law (Laws 1900, p. 61, c. 20) provides that the forest preserve shall include lands owned or hereafter acquired by the state, among others those within the county of Herkimer. And section 7 of article 7 of the state Constitution provides for the reservation of the lands constituting the forest preserve. It requires that they shall be kept as wild forest lands, not leased, sold, or exchanged, nor to be taken by any corporation, public or private, and prohibits the sale, destruction, or removal of timber thereon. Section 222 of the forest, fish, and game law (Laws 1900, pp. 63, 64, c. 20) authorizes an action to recover damages for trespass or waste on the lands of the forest preserve, and, among other things, subjects a person who cuts or carries away any tree, timber wood, or bark from state lands in the forest preserve to a penalty of $10 for each tree cut or taken away or destroyed by him or under his direction.

More serious, however, is the question of the ownership of the lands. Unless they belong to the state, or the state has such an interest in them as to own the timber, manifestly this action is not maintainable. It is claimed on behalf of the state that it acquired an absolute title in fee from the defendant Mary L. Fisher through various acts and proceedings done and taken on behalf of the state, and what occurred between the officers of the state and the defendant Fisher, which will be hereafter referred to. The lands are a part of a tract of 9,600 acres, which is about 6 miles long north and south and 2½ miles wide east and west, through which the Beaver river flows in a westerly direction, eventually flowing into the Black river. The Beaver river divides the tract so that about three-fifths of it is north of the river and two-fifths south thereof. A creek known as "Twitchell Creek" flows from the south line of the tract into the Beaver river about half a mile above the west line of the tract. The tract is timber land, except about 2,300 acres covered by the pond made by the dam built by the state, as will be hereafter stated.

It is claimed on behalf of the state that it acquired not only the title to the 2,300 acres covered by the pond, but as well to a belt of land

immediately surrounding the pond, comprising about 450 acres, making in all 2,754 acres. This tract of 2,754 acres is regular in shape, the exterior of which is bounded by a right angle survey line, and includes within its bounds substantially all of the arms, bays, and inlets of the pond, the shore line of which is irregular, the surrounding land varying in elevation; some places rising abruptly, and others rising more gradually and gently. The cutting of the timber in question was done on this belt skirting the pond, on high land, on the northwest part of the 2,754-acre tract. In the month of June, 1886, the superintendent of public works of the state, pursuant to chapter 336 of the Laws of 1881, for the purpose of supplying to the Black river a supply of water, began the construction of a dam on Beaver river, half a mile below the defendant Fisher's lands. The dam was completed in 1887, and was nine feet high. It caused the water to back up Beaver river and Twitchell creek, and completely inundate 1,594 acres of the defendant's land, destroying the timber thereon. Afterward, and in the year 1893, pursuant to chapter 469, p. 935, of the Laws of 1892, the superintendent of public works raised the dam an additional 5 feet, thus making the dam 14 feet high. The reservoir was filled and the dam became operative in 1894, some time before October of that year, resulting in a like overflow and inundation and destruction of timber thereon of about 700 acres in addition to the 1,594 acres theretofore covered by the water so set back, making about 2,300 acres so covered by the pond. It appears that after the first overflow, and in the month of September, 1888, the defendant Mary L. Fisher presented and filed with the board of claims of the state a claim duly verified for the damages sustained by such overflow, claiming that 2,000 acres of her said lands, on which was a large amount of valuable timber, was overflowed by the water setting back, by means of the dam constructed by the state, completely inundating the same and constituting a permanent pond of the body of the reservoir holding the water which had been so set back, and rendering it of no value for other purposes; that it was designed to be permanent, and the reservoir to be perpetual; and that the state had permanently deprived her of the lands and of all use and benefit thereof, and had appropriated the same and the timber thereon to the state's own exclusive use and benefit. She further claimed that by reason of the construction of the dam and the raising of the level of the water and the resulting permanent inundation and overflow of her lands adjoining Beaver river and its tributaries, adjacent lakes, bays, ponds, inlets, and creeks for miles thereabout, and the destruction of the natural current and course of the said river and its tributaries and their tributaries, had cut off and rendered inaccessible, 7,500 acres of heavily timbered land not overflowed, and had greatly injured it and destroyed the highways, to wit, the streams whereby the timber on said lands not overflowed, could have been conveyed to the market, and had deprived her of the roadway and waterway in utilizing the timber of the land, greatly damaging the remainder of the 7,500 acres and the timber thereon. She also claimed that timber was taken by the officers of the state in constructing the dam. She placed her damage at $45,000. The matter was tried before the board of claims, and an award was made on the 29th day of December, 1891, to her for the sum of $9,970. The

board of claims in its decision finds that the state had permanently appropriated to its use, for the dam and reservoir of the land, islands, lakes, creeks, and rivers, belonging to the claimant Mary L. Fisher 1,594²²/₁₀₀ acres of land and water, as appeared from a map and survey made in October and November, 1887, and July to October, 1890, showing the flow lines of the said reservoir and the land and water so taken and permanently appropriated, and filed in the office of the clerk of the board of claims. On or about the 8th day of February, 1892, the superintendent of public works drew his draft upon the Treasurer of the state in favor of the defendant Mary L. Fisher for the amount of the award, and this draft was paid on the 12th day of April, 1892.

After the raising of the dam in 1892, and on or about the 4th day of February, 1895, the defendant Mary L. Fisher presented and filed a like claim for damages sustained by her in consequence of the additional overflow caused by the raising and reconstruction of the dam, as has been stated. In that claim she likewise stated that the state had appropriated land, this time to the extent of 700 acres, and put it into permanent use for the purpose of a reservoir, and that the trees and timber thereon had been destroyed and rendered valueless; that the state had erected a dam for the purpose of perpetually maintaining an overflow and for the collection of the waters of the river and creek above the dam, and demanding an award of $21,000. This claim was likewise heard before the Court of Claims, and an award seems to have been agreed upon. On the 10th day of November, 1897, the Court of Claims awarded her the sum of $4,500, and, as is therein stated, in settlement; the claimant and the officers of the state having apparently reached an amicable adjustment. The judgment making the award specifically stated that it was for the permanent appropriation of the lands therein accurately and precisely described, which comprise the 2,754 acres. After the award had been made, and before the warrant to pay the same had been delivered to the defendant Mary L. Fisher, and on the 14th day of July, 1898, the superintendent of public works duly filed in the office of the state engineer and surveyor the map described as the "right-angle survey," together with a description of the 2,754 acres of land, precisely as described in the award, which map was certified by John W. Tate, resident engineer, July 8, 1898, and also by the state engineer and surveyor July 14, 1898, and also by the deputy superintendent of public works, with the statement thereon, "Permanently appropriated for the use of the canal." The superintendent caused a copy of the said map and of the said certificates on the same and a description of the premises described in the award and in the complaint to be personally left with the defendant Mary L. Fisher July 18, 1898, together with a notice dated July 16, 1898, signed by the superintendent of public works, stating:

"That in pursuance of chapter 338 of the Laws of 1894, you are notified that a map and survey of that portion of your lands and premises appropriated by me for the purpose of a reservoir at Stillwater, on the Beaver river, was filed in the office of the state engineer and surveyor on the 14th day of July, 1898, and a copy of the said map and survey is attached."

This was signed by the deputy superintendent of public works. On the 19th day of July, 1898, the superintendent of public works caused

to be filed with the clerk of Herkimer county copies of the map, certificates, and notice with proof of leaving them personally with the defendant Fisher. Thereafter, and on the 22d day of July, 1898, the superintendent of public works drew his draft upon the Treasurer of the state in favor of Mary L. Fisher for the sum of $4,500, with the statement therein contained that it was in full of an award of the Court of Claims made on the 10th day of November, 1897, for a permanent appropriation of and damages to lands in Herkimer county by reason of the reconstruction and raising of the crest of the dam on Beaver river at Stillwater by the state, and in full discharge of any claim of Mary L. Fisher against the state. And the defendant Mary L. Fisher likewise executed and delivered to the superintendent of public works an acknowledgment in writing by which the defendant acknowledged the receipt of the draft in full of the award, containing the same statement as the draft. This draft was presented and paid on the 4th day of August, 1898. No other claim or further claim has ever been presented by the defendant for taking and appropriating the said 2,754 acres. The referee decided, and correctly we think, that the defendant Mary L. Fisher had been divested of her title to the 2,754 acres, and that the state had acquired the same, and became and is the owner in fee simple thereof, and that the same are within and form a part of the forest preserve.

We are in entire accord with the views of the learned referee as expressed in his opinion, except in one aspect of the case to which we will call attention; and that does not affect the result. The referee held that the defendant Mary L. Fisher was not divested of the fee in the lands by any or all of the acts or proceedings before referred to, save by the making, serving, and filing of the map, which he held should be construed as an appropriation of the fee of the 2,754 acres in which the state already owned a permanent easement. We think that, even if the making, serving, and filing of the map did not have the effect alone to divest the defendant of the fee in the 2,754 acres, what was done by the authority of the state upon these lands, the defendant claims, the awards made thereon and what occurred in connection therewith and subsequently thereto, including the map, did divest her of her title, or at least now conclude her from asserting any claim of ownership in the lands against the state. While the board of claims had no jurisdiction to determine the necessity for taking the lands, it could determine what interest and how much had been taken and appropriated. Indeed, it was necessary to do so to determine the amount of the award. If the claimant's statement is to be relied upon, the lands had been appropriated, even beyond the bounds of the pond, and no value remained in the owner, except possibly the naked fee. The second award founded upon the claims so made, and presented to the board of claims by the claimant, and the recitals in the judgment that the entire 2,754 acres had been permanently appropriated, shows that the state had taken the entire interest, and full compensation was awarded therefor; and, if so, it is not apparent how she can now claim to own the timber or to have any interest of value in the lands. Even if this award, standing alone, did not have that effect, taken in connection with the judgment, the claim made by the superintendent of

public works by filing and serving the map, and the statement in the draft given her thereafter by him on the treasurer, and the like statement contained in her written acknowledgment, and she having accepted payment under those conditions, it is difficult to see how she can now claim that she has any further interest in the lands. It was early the policy of the state to acquire the title in fee to the lands appropriated by the state for canal purposes. Chapter 262, p. 301, Laws 1817. This policy has been adhered to uniformly, and has been incorporated in our present statute law. Section 73 of the canal law (Laws 1894, p. 636, c. 338) provides that:          '

"The title to all real property permanently appropriated for the use of the canals of the state shall be vested in the people of this state."

Until 1830 there was no provision in our law which provided for acquiring a less interest than a fee in any lands for canal purposes, however limited or restricted the use of the lands might be. By chapter 293, p. 356, of the Laws of 1830, an appraisal was authorized for the overflowing of lands by the erection of any dam by the canal officers, or for the occupation or entry of any river or streams connected with the public works; and these provisions have been incorporated in the canal law of the state. Canal Law, §§ 70, 74. There is, however, no provision in the law which prevents the acquiring in fee of lands for storing water for the use of the canals. Section 70 of the Canal Law (Laws 1894, p. 635, c. 338) specifically authorizes the superintendent of public works to "enter upon and take possession of and use any lands, structures and waters, the appropriation of which for the use of the canals and the works connected therewith, and for the execution and completion of any repairs and improvements directed by the canal board to be made, shall in his judgment be necessary." It then provides for the making, filing, and serving of a survey and map of the lands, with the notice, as was done in this case. That provision was new when it was enacted in the canal law in this section in 1894, in effect October 1st of that year, the purpose of which was evidently to make more certain the lands and interest therein which was to be acquired from the owner. Before that the precise lands and the nature of the right therein was determined by the mere taking of possession and the use and the circumstances indicating the intention of the state officers having the matter in charge. Property required for canal purposes has always been taken in a summary way without judicial proceeding. Waterloo Woolen Manufacturing Co. v. Shanahan, as Superintendent, etc., 128 N. Y. 345, 28 N. E. 358, 14 L. R. A. 481. We think the circumstances clearly show in this case that it was the intention of the proper officer of the state to acquire the title in fee of the lands in question, and whatever uncertainty may have existed in that regard was eventually settled by the last proceeding before the board of claims, and by what followed between the officers of the state and the defendant Mary L. Fisher; that the map was made, served, and filed more as a precaution against any claim which she might make, and not as an absolute necessity. However, if it be true that up to that time the state had acquired but an easement in the lands, we agree with the learned referee that the making, filing,

and serving of this map show that it was the intention at that time completely to extinguish any interest which Mary L. Fisher might have in these lands, and that the state acquired the same.

It is contended on behalf of the defendants that while the state had the right to take for canal purposes such lands as were necessary therefor, and acquire such interests therein as were needed for that use, the belt of land immediately surrounding this reservoir or pond of water was not needed therefor. Hence the state could not acquire the same. We think it cannot be said that the state had no right to acquire the title to the lands upon which the waters were stored, including such as lie between the inlets and bays and immediately surrounding the same, nor that the officer charged with the duty of determining the needs of the state in that regard was not justified in concluding that the lands were so needed. The mere fact that some of this timber is upon high ground and that some of the land is somewhat remote from the main body of water, is not sufficient to warrant us in holding that the superintendent of public works, a constitutional officer, upon whom devolves the duty of determining the question, was wrong in deciding that the best interests of the state required their acquisition for use in connection with the canal system of the state, and that the interest in the land so to be acquired should be in fee simple. The claims which were made from time to time resulting from the overflow of these lands, as well as what might result from floods and otherwise, the preservation and protection of the water supply, and other conditions which we do not know and cannot foresee, may make it entirely proper and necessary for the state to own in fee, not only the land underneath the main body of water, but as well that which lies between the bays and smaller bodies of water directly connected with the main body and surrounding it. The suggestion that the timber on this belt around the main reservoir or basin is not needed for canal purposes applies with equal force to such of the timber as may be upon the islands or other exposed portions of land within this general basin. It is the general rule that the necessity for exercising the right of eminent domain is a question of a political rather than of a judicial nature; that its determination rests with the Legislature, and the courts have no power to review it; and that the Legislature may delegate the power to public officers, whose determination is likewise conclusive upon the courts. Matter of Fowler, 53 N. Y. 60; People v. Smith, 21 N. Y. 595. And, so, whether it will take the title in fee or simply acquire an easement is likewise a question of that character. As was said by Judge Andrews in Sweet v. B., R. & P. Ry. Co., 79 N. Y. 293, 300:

"When the statute authorizes the taking of a fee, it cannot be held invalid, or that an easement only was acquired by proceedings thereunder, on the ground that in the judgment of the court the taking of an easement only would accomplish the public purposes which the Legislature had in view. That is a legislative, and not a judicial, question."

We do not decide that where an officer of the state assumes to take private property, ostensibly in the exercise of a discretionary power vested in him by the Legislature, which clearly can be seen, under no circumstances and in no event, will be needed for public purposes, courts may not intervene and determine contrary to the expressed

judgment of such officer the question of the necessity for taking the same, and judicially declare such an assumption of authority nugatory. But the circumstances of this case we think do not establish that fact.

Neither do we think that the holding of this belt of timberland in connection with the canal system is inconsistent with it being a part of the forest preserve. Its purpose is not to cut the timber and devestate the land, but the reverse. One of the reasons, and perhaps the principal one, for putting into the Constitution the provision forbidding the disposition of the lands of the state within the territorial limits of the forest preserve and forbidding the selling and destruction of timber thereon, is to protect and preserve the water supply, and it is entirely consistent with the use to which they are put in connection with the canals. We think the protection afforded this land by being within the forest preserve is quite in accord with the settled policy of the state, not only to acquire the title in fee and become the absolute owner of the lands acquired by it for canal purposes, but to hold the same permanently, and to control and have the sole possession thereof entirely free from other rights and claims which might interfere with and hinder the state in carrying on this great public work.

The judgment should be affirmed, with costs. All concur, except McLENNAN, P. J., and NASH, J., who dissent on the ground that the evidence conclusively establishes that there was no necessity on the part of the state for acquiring title to or interest in the strip of land in question and which surrounds the storage reservoir created by the state; and, further, that there is no act of the Legislature which authorizes such taking or the taking of any land belonging to the defendant Fisher other than such as was overflowed as a result of the construction of the dam which was authorized; and, further, upon the ground that the defendant is not estopped by the award made to her and the acceptance thereof from insisting that the title to the strip of property in question is still in her, and that she has the right to dispose of the timber thereon.